# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH KIK MESSENGER ACCOUNT "letstradeyung92" THAT IS STORED AT PREMISES CONTROLLED BY MEDIALAB.AI INC. | Case No.: 3:23-mj-00128-MMS |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Sarah North, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since July 2017.

2.     As a Special Agent with the FBI, I investigate violations of the laws of the United States. I am currently assigned to the Violent Crime Squad in the FBI Anchorage Field Office, and specifically assigned to work investigations relating but not limited to violent crimes against children and internet crimes against children, which includes online enticement of minors, distribution and possession of child pornography, and commercial sexual exploitation and trafficking of minors. I have conducted and participated in numerous executions of search warrants, arrest warrants, and interviews of people involved in various crimes, including crimes related to child pornography, enticement of minors, and the sexual exploitation of minors. I have also

attended trainings specific to investigating crimes against children and the enforcement of federal child pornography laws.

3.      This affidavit is made in support of an application for a search warrant for information which is associated with Kik Messenger account username "**letstradeyung92**" (hereinafter, "SUBJECT ACCOUNT"), which is stored at premises controlled by **MediaLab.Ai Inc.** (hereinafter, "MediaLab"), a holding company of consumer internet brands including Kik Messenger which is an electronic communications services provider and/or remote computing services provider, located at **1237 7th Street** in **Santa Monica, California**.  The information to be searched is described in the following paragraphs and in Attachment A.

4.      This affidavit is made in support of an application for a search warrant under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A).  I anticipate executing this warrant to require **MediaLab** to disclose to the government copies of records and other information, including the *content* of communications, as particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate items described in Section II of Attachment B.

5.      The statements in this affidavit are based in part on information provided to me by other law enforcement agents, police reports, documented interviews of the defendant and witnesses, records generated from the investigation by other special

3:23-mj-00128-MMS

agents, and my own investigation of this matter. Since this affidavit is being submitted

for the limited purpose of securing the search warrant, I have not included all facts

known to me concerning this investigation. I have only set forth the facts that I believe

are necessary to establish probable cause that evidence of federal violations is in

SUBJECT ACCOUNT.

6.      Based on my training and experience and the facts as set forth in this

affidavit, there is probable cause to believe that the following violations have been

committed by **JEREMY SCOTT DANIELS** ("SUBJECT TARGET") through his use

of SUBJECT ACCOUNT:

      a.  18 U.S.C. § 2252A(a)(2)(A), (b)(1), Distribution of Child Pornography;

         and

      b.  18 U.S.C. § 2252A(a)(5), (b)(2), Possession of Child Pornography.

Accordingly, there is also probable cause to search SUBJECT ACCOUNT for the

information described in Attachment A for evidence of these crimes as further

described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is "a

court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a),

(b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . .

. that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

3:23-mj-00128-MMS

8.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## **RELEVANT STATUTES**

9.      The relevant statutory authorities used in this affidavit in support of this application for a search warrant and its attachments are described below:

 a. 18 U.S.C. § 2252A(a)(2) provides, in relevant part, that:

> Any person who . . . knowingly receives or distributes any child pornography [or any material that contains child pornography,] using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer . . . shall be punished as provided in subsection (b).  Subsection (b)(1) provides the punishment range for "[w]hoever violates, or attempts or conspires to violate" subsection (a)(2).

 b. 18 U.S.C. § 2252A(a)(5)(B) provides, in relevant part, that:

> A person who . . . knowingly possesses, or knowingly accesses with intent to view . . . material that contains an image of child pornography that has been . . . transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been . . . transported in or affecting interstate or foreign commerce by any means, including by computer . . . shall be punished as provided in subsection (b).  Subsection (b)(2) provides the punishment range for "[w]hoever violates, or attempts or conspires to violate" subsection (a)(5).

3:23-mj-00128-MMS

4

## <u>BACKGROUND ON KIK MESSENGER</u>[1]

10.     **MediaLab** is a holding company that owns and operates many internet brands including Genius (music information and lyrics); Imgur (images, memes, GIFs, visual stories); Amino (network of interest-based online community), Whisper (platform for anonymous posting); and Kik Messenger, among others.  **MediaLab** acquired Kik Messenger from Kik Interactive, and made an announcement on October 18, 2019.

11.     **Kik Messenger** is a free online chat platform that enables users to chat directly, one-on-one with another user, in groups, and with a chat bot.  Groups can be private or public.  Users sign up for a new account by choosing any first name and last name.  This will be the user's display name and can be changed at any time.  The user will also create a "username" and enter a valid email address.  Additionally, Kik Messenger also asks users to create a password, enter their birthdates, and enter their phone number to sign up.

---

[1] This section is based on information published by Kik Messenger, Kik Interactive Inc., and MediaLab.Ai Inc. on their websites, including, but not limited to, the following webpages: "Brands" https://medialab.la/brands; Acquisition Information, http://wwwl.kik.com/blog/kik-medialab-acquisition/; Kik Homepage, https://www.kik.com/; Features, http://wwwl.kik.com/features/; "Your Safety is Important to Us," http://wwwl.kik.com/safety-center/; "About Kik," https://kikhelpcenter.zendesk.com/hc/en-us/sections/1260803061410-About-Kik; "Using Kik," https://kikhelpcenter.zendesk.com/hc/en-us/categories/1260802604609-Using-Kik; "Messaging Questions," https://kikhelpcenter.zendesk.com/hc/en-us/sections/1260803066429-Messaging-Questions; "About Kin," https://kikhelpcenter.zendesk.com/hc/en-us/sections/1260803066369-About-Kin; "Tipping on Messages," https://kikhelpcenter.zendesk.com/hc/en-us/articles/4402344285851-Tipping-on-Messages.

3:23-mj-00128-MMS

12.     Kik Messenger is available for iOS and Android systems.  It is a mobile application that be downloaded online onto a device from the website http://www.kik.com.

13.     A Kik Messenger "username" is completely unique to a user's account and cannot be changed. If a user wanted to add another specific user, they must have the right username otherwise they will not be able to find that other user in a search. Usernames are made up of letters, numbers, periods, and underscores.

14.     A Kik Messenger "display name" is what a user's friends see within the friend's Chat List, at the top of a chat screen with that user, and in the group info screen. Display names can be changed at any time and can include a variety of letters, numbers, characters, and emojis.

15.     Kik Messenger allows for several messaging functions aside from text. Users can send GIFs and emojis from the application by browsing or searching for a GIF through use of a hashtag.  Users can also transmit photos and videos to other users. Users can send photos and videos from their device gallery, or capture a new photo or video to send.  Kik Messenger allows users to add a caption to a photo or video as well as apply a filter to a picture.

16.     Kik Messenger allows a user to delete messages or entire chats, including deleting a group chat.  By deleting a group chat, the user will leave the group chat.  In addition, a user can delete their entire message history which will clear all messages from all chats that a user has in their main chat list.

3:23-mj-00128-MMS

17.    A Kik user's messages are stored locally on that user's device (within in the Kik application). If a user does not log out of or delete the Kik application, then that user's recent chat history will be saved on their device. For IOS devices, the last 1000 messages of a user's recent chats within 48 hours will be appear for the user; and for older chats, the user will see the last 500 messages. For Android devices, the last 600 messages of a user's recent chats within 48 hours will be appear for the user; and for older chats, the user will see the last 200 messages.

18.    Kik Messenger's bots allow users to chat with it, take quizzes, obtain news, work through problems with the wellness bot, and more. Bots can also be integrated into group chats to play games with users within a group.

19.    Kik Messenger allows users to sync phone contacts to locate other users. It also provides each user with a "Kik Code" which is a quick and easy way to add friends and join groups on Kik. A user only needs to select "Scan a Kik Code" from the main chat list and then scan a "Kik Code" to gain access.

20.    Kik Messenger also has a second product known as "Kin," which is a cryptocurrency created by Kik to be used within this application. For example, a user can use the Kin cryptocurrency located in their Kin balance to "tip" another user by sending it directly to that other user.

21.    While **MediaLab** does not generally retain the content of user chats, private or group messages, the record of who sent it and when still exists. **MediaLab**

3:23-mj-00128-MMS

7

may retain time-stamped chat logs, which are records and information that is roughly analogous to the call detail records maintained by telecommunications companies.

22.    Your affiant is informed that while Kik does not collect and produce the text and content of communications generally, the retention said materials is different when it is subject to an abuse report.

23.    Your affiant is further informed that Kik currently stores National Center for Missing and Exploited Children ("NCMEC") materials in a segregated system and can search that database when provided with a NCMEC cybertip number.

24.    **MediaLab** also retains Internet Protocol addresses ("IP address") history used to access account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

25.    As explained herein, information stored in connection with a Kik Messenger account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating officials to establish and prove each offense-element.

3:23-mj-00128-MMS

26.     As further explained herein, your affiant has knowledge that the SUBJECT TARGET had accessed and used SUBJECT ACCOUNT, and as further reported by Kik Messenger through a NCMEC cyber tip report.

## SOCIAL MEDIA MOBILE APPLICATIONS
## AND CHILD PORNOGRAPHY

27.     Based upon my training and experience as well as my discussions with others involved in child pornography and sexual exploitation of children investigations, the modern use of computers, devices, and technology, including mobile applications, have revolutionized the way in which child pornography is produced, distributed, received and possessed.

28.     The development of mobile technology and social applications, such as Snapchat, Instagram, WhatsApp, Kik, and Discord, among many others, have revolutionized the ways in which children are exploited online, enabling greater access, often with anonymity, for offenders with a sexual interest in children to produce, share, sell, trade, distribute, receive, and collect child pornography.

29.     Social applications have allowed both offenders and users alike to maintain anonymity. Some applications employ end-to-end encryption to mask communications between users.  This can allow offenders to evade detection by law enforcement, and reduce the likelihood that their abuses would be detected.

30.     Social applications have allowed offenders with a sexual interest in children to maintain ongoing relationships with targeted minors more readily over time, and thereby giving these offenders mechanisms to facilitate the grooming process

3:23-mj-00128-MMS

9

where offenders manipulate the victims to gain trust, employ control, and coerce the victims to agree to certain abuses, including the engaging minors in the production of child pornography. Based on my training and experience, this type of behavior by offenders are not limited to one social application but can span across multiple social media technologies and last months or even years, demonstrating a pattern of conduct. Often the goal of the offender is to reduce the targeted child's inhibitions in preparation for anticipated sexual activity.

31.     As a result of the advent of new social media technology, it has become relatively inexpensive and technically easier to produce, store, and distribute child pornography. In addition, there is the added benefit to the distributor and producers of child pornography mask their trail and make it more difficult for law enforcement to follow. In some cases, depending upon the sophistication of the producer, it may be virtually impossible to law enforcement to determine the source of a sexually explicit image.

32.     Offenders, through use of social media technologies and online applications, have been known to demonstrate overt interest in a child, seek to create opportunities to be alone with the child, advise the child to engage in certain risky behavior, fixate on the child, display affection, and give gifts through social applications.

33.     Offenders, through use of social media technologies and online applications, have been known to encourage and engage children in "sexting," which

3:23-mj-00128-MMS

10

based on my training experience may include various forms of communications that are sexually based and often include messaging about sexually explicit conduct and sharing sexually explicit photographs.

34.     Offenders, through their use of social media technologies and online applications, have been known to encourage children to share sexually explicit photographs of themselves for purposes of collecting child pornography. The advent of social media applications has allowed additional ways for children to share images with offenders, including sending actual photographs, videos, and temporary photos (otherwise known as self-destructing media), which can be captured through screenshots, downloaded, or otherwise saved by the offender.

35.     Offenders, through their use of social media technologies and online applications, have been known to disclose to children information about sexually explicit acts to arouse and condition normalization of sexual activity under the guise of education and advice. This might even include showing children sexually explicit images.

36.     Offenders, through their use of social media technologies and online applications, have greater capacity and ease to transfer, share, trade, and collect high volume of child pornography as well as promote the continued distribution of contraband material at a quicker all while retaining the ability to evade detection by law enforcement.

## IDENTIFICATION OF SUBJECT ACCOUNT

37.     On 7/9/2020, Kik submitted **cyber tip report number 74539383** to NCMEC.  The report identified four videos of child pornography, which were uploaded by a Kik account by the username: "letstradeyung92" (i.e. SUBJECT ACCOUNT). SUBJECT ACCOUNT was created using email address "jeppej910@gmail.com."

38.     On ten occasions, SUBJECT ACCOUNT sent one or more of the four videos containing sexually explicit materials of children, further described below, to either another user via private chat message or to a group of users on Kik.  Those uploads onto Kik were conducted utilizing five different IP addresses (107.242.120.93, 107.242.120.73, 107.242.120.110, 107.242.120.128, and 107.242.120.41).  Those uploads occurred **between 5/30/2020 and 6/22/2020**.  NCMEC then forwarded this information to the FBI for follow-up.

    a.  The reported video file "0e076daa-0b2f-4bb0-ad89-2800b3737cea.mp4" was reviewed by the FBI and is described as:  An approximately 5-7 year old child, dressed in a tiger pattern costume, has an erect adult penis in her mouth.  The video is 00:47 seconds long.

    b.  The other reported video file "68d35f29-896e-469f-97ed-33b7dd1d46bc.mp4" was reviewed by the FBI and is described as:  A prepubescent female, approximately 5-8 years old, dressed in a pink shirt and pants, is standing on a bed.  She pulls down her pants and underwear, exposing her genitals, and lies on her back with her legs in the air.  An

3:23-mj-00128-MMS

12

adult, presumably the camera operator, uses a dark colored dildo to separate the child's labia and partially penetrate her vagina. The video is 1:14 minutes long.

c. The other reported video file "74ff32a8-3f08-41bf-94a7-41b2f439c388.mp4" was reviewed by the FBI and is described as: A prepubescent female, approximately 5-7 years old, is sitting on a couch with her knees bent and legs spread, exposing her genitals. She is nude expect for wearing a pair of American flag patterned thigh high socks. She has a pink anal plug inserted in her anus. The child rubs her fingers over her genitals. She moves to her hands and knees and continues to use her fingers to rub her genitals. The video is 3:59 minutes long.

d. The other reported video file "a9cc15ca-c816-426a-a1b1-3fef93851520.mp4" was reviewed by the FBI and is described as: An adult male puts his penis in the mouth of a prepubescent female, approximately 3-5 years old. At the same time, a second adult male rubs his penis against the child's face. The video is 00:21 seconds long.

39.    On 8/3/2020, law enforcement served a subpoena to Kik relating to SUBJECT ACCOUNT. Kik provided the user's first and last name as "Yung Fun," email "jeppej910@gmail.com," and username "letstradeyung92." Kik also provided a list of IP addresses used to login to SUBJECT ACCOUNT from 3/9/2020 to 6/17/2020. This list included IP address **24.237.220.152**. Between 3/9/2020 and 6/12/2020,

3:23-mj-00128-MMS

SUBJECT ACCOUNT was accessed around 956 times from IP address **24.237.220.152**. During the overlapping period between 5/30/2020 through 6/22/2020, SUBJECTACCOUNT had also uploaded the four video files containing child pornography to other users on Kik utilizing five other IP addresses that belonged to AT&T Wireless.

40.     On 8/3/2020, law enforcement served a subpoena to Google for information pertaining to e-mail address "jeppej910@gmail.com," the email account that was used to create SUBJECT ACCOUNT. Google provided the user's name as "**Jep Pej**." The e-mail account of "jeppej910@gmail.com" was created on 1/14/2020. Google also provided a list of login dates and times with the respective IP addresses used to access the account. This information showed that a user accessed the "jeppej910@gmail.com" e-mail account from the same IP address of **24.237.220.152** on 3/23/2020 and 6/3/2020.

41.     On 8/11/2020, a subpoena was then served to General Communications, Inc. (GCI) for subscriber information of the IP address **24.237.220.152** on 3/9/2020 at 1:03:00 PM UTC and on 6/12/2020 at 6:53:17 AM UTC. These two dates and times were two of the hundreds of times that the user accessed SUBJECT ACCOUNT utilizing IP address **24.237.220.152**. Per returned information from GCI, the subscriber for the account was Tex Daniels at 19155 S. Birchwood Loop Road, Chugiak, in Alaska (hereinafter, SUBJECT RESIDENCE) for both dates and times.

3:23-mj-00128-MMS

42. Investigators further determined from records that SUBJECT TARGET had previously claimed SUBJECT RESIDENCE as his address, along with two other individuals including Rhonda Daniels and Tex Daniels.

43. Investigators learned that SUBJECT TARGET's 2021 PFD application was submitted online on 1/26/2021, utilizing IP address 69.178.10.192. On 5/18/2021, law enforcement served a subpoena to GCI that requested subscriber information for IP address 69.178.10.192 on 1/26/21 (the date SUBJECT TARGET submitted his PFD application). The returned documents showed the subscriber for IP address 69.178.10.192 was again Tex Daniels at SUBJECT RESIDENCE.

44. On 11/26/2021 a search of the Alaska Public Safety Information Network (APSIN) was conducted for Tex Daniels, Rhonda Daniels, and SUBJECT TARGET. All three individuals had SUBJECT RESIDENCE listed as their residential addresses.

45. A search of FBI records also revealed a reference to SUBJECT ACCOUNT in another FBI investigation out of the Philadelphia Division. Around August/September 2020, an Online Covert Employee (OCE) in Philadelphia was a member of Kik group "#ch.ildren (Share and T R A D E)" in an undercover capacity. One of the admins for this group was SUBJECT ACCOUNT. The OCE observed multiple images depicting child pornography in this Kik group.

46. A search of FBI records further revealed a reference to the email account "jeppej910@gmail.com" in an investigation out of FBI Headquarters:

3:23-mj-00128-MMS

15

a. In or around October 2020, New Zealand Department of Internal Affairs (DIA) provided the FBI with a list of users obtained during a DIA investigation. The DIA investigation located users who had accessed a cloud-storage provider by the users clicking on a link that contained child pornography. The email account "jeppej910@gmail.com" was registered as one of the accounts that clicked on that link.

## EXECUTED SEARCH WARRANT ON SUBJECT RESIDENT

47. On 1/25/2022, law enforcement obtained a federal search warrant 3:22-mj-00022-KFR for SUBJECT RESIDENCE. The Honorable Chief Magistrate Judge Matthew M. Scoble granted the search warrant, which was then executed by law enforcement on 1/28/2022.

48. SUBJECT TARGET was contacted at SUBJECT RESIDENCE and then interviewed by investigators.

## SUBJECT TARGET INTERVIEW

49. SUBJECT TARGET was provided his Miranda Rights and he agreed to talk with interviewing agents. The following is a summary of the pertinent parts of that interview:

a. SUBJECT TARGET lives with his mother, Rhonda Daniels, and his uncle, Tex Daniels. Rhonda and Tex are siblings.

b. SUBJECT RESIDENCE is SUBJECT TARGET's childhood home.

3:23-mj-00128-MMS

c.  SUBJECT TARGET stated he used Facebook, Instagram, and Snapchat. He claimed he did not use Kik, however.

d.  SUBJECT TARGET claimed he had a cell phone and a laptop computer. The cell phone is a Galaxy in a black case and SUBJECT TARGET didn't recall what kind of laptop he had.  SUBJECT TARGET believed his cell phone should be located in the living room area.

e.  SUBJECT TARGET stayed in the living room of SUBJECT RESIDENCE.  Tex and Rhonda each have their own bedrooms in SUBJECT RESIDENCE.

f.  Rhonda has an older iPhone, a laptop (small blue), and a desktop computer in her room.

g.  Tex has a generic cell phone and laptop.  SUBJECT TARGET did not know if Tex had any other electronic devices.

h.  They have Wi-Fi at SUBJECT RESIDENCE, which is password protected.  Tex, Rhonda, and SUBJECT TARGET have access to the Wi-Fi.  SUBJECT TARGET could not recall if anyone else had access to the Wi-Fi.  SUBJECT TARGET stated they had the same password for the Wi-Fi for over 10 years and that the password may have gotten out.  The password was "your beard is good."  SUBJECT TARGET used that as a password for many things.

3:23-mj-00128-MMS

17

i.  When interviewing agent explained to SUBJECT TARGET that the person using SUBJECT ACCOUNT accessed it from the IP address registered to SUBJECT RESIDENCE over 900 times, SUBJECT TARGET responded, "that's weird."  SUBJECT TARGET stated he did not recognize the name "Yung Fun," username "LetsTradeYung92", or the email jeppej910@gmail.com.  SUBJECT TARGET did not think that Rhonda or Tex would have done that (used the SUBJECT ACCOUNT). SUBJECT TARGET denied using the Kik account.

j.  SUBJECT TARGET stated he needed to call someone, and clarified he wanted to call his cousin, Scotty Perkins, who is also an attorney. SUBJECT TARGET stated he felt like he was "being ganged up on" and stated, "I know you're asking question, but I didn't do this."  SUBJECT TARGET clarified that the interviewing agents were being "civil" and said "you guys are doing great."  SUBJECT TARGET went on to say that he's been accused of a lot of things he did not do and felt like he was having a PTSD "kind of thing." SUBJECT TARGET stated his ex-wife accused him of things that did not happen and he lost his kids for almost a year because of that accusation.

k.  SUBJECT TARGET asked what would happen if he walked away (from the interview).  The interviewing agent explained the general process of the search procedures for the residence, the kind of things that were

Case 3:23-mj-00128-MMS   Document 1-1   Filed 02/24/23   Page 18 of 31

authorized to be collected by the search warrant, and how those items would be further examined.

l. At this point in the interview, SUBJECT TARGET was offered the opportunity to step out of the vehicle to smoke, which he did, while remaining in the presence of the interviewing agents.

m. A Samsung cell phone (hereinafter, SUBJECT PHONE) was brought to the interviewing agents by a member of the search team. SUBJECT TARGET identified the SUBJECT PHONE as being his. Access to the SUBJECT PHONE was fingerprint protected.

n. Upon finishing his cigarette, SUBJECT TARGET stated he wanted to call his cousin, Scotty Perkins (the attorney). SUBJECT TARGET did not know Scotty's cell phone number and requested that he be able to go into the residence to find the number. SUBJECT TARGET declined to provide the password/thumb print to access his phone until he talked to Scotty Perkins. Interviewing agents accompanied him into the residence.

o. SUBJECT TARGET was provided a copy of the search warrant and was directed to Attachment B, paragraph four, which outlined the authority to compel the owner of a cell phone to depress his/her finger/thumb on the phone to open it. SUBJECT TARGET complied and opened the SUBJECT PHONE with his thumb print.

3:23-mj-00128-MMS

p.  At this point the recording was paused as the interviewing agents stepped away from SUBJECT TARGET.

q.  The recording was re-started and interviewing agent provided her FBI cell phone to SUBJECT TARGET so that he could call Scotty Perkins (702-449-5195).  The recording was paused again while SUBJECT TARGET conducted his phone call to Scotty Perkins.  The interview was concluded, and the recording stopped.

## FORENSIC REVIEW OF SUBJECT PHONE

50.  A Cellebrite extraction was completed on SUBJECT PHONE, among other devices seized by law enforcement.

51.  Based on this Cellebrite extraction, the data showed information of the following user accounts and sites (among others), several of which are known to your affiant to be related to adult sexual encounters, located on SUBJECT PHONE:

a.  Snapchat with username "jpej19" and account name "Jeremy";

b.  Gmail with email "jeppej760@gmail.com";

c.  Grindr with email "jeppej760@gmail.com" and account name "hi";

d.  Whatsapp associated with email "jeppej760@gmail.com";

e.  Ashleymadison.com associated with username "Kinkyjep907"

f.  Scruff associated with email "jeppej760@gmail.com" and account name "MobileCockSlut";

g.  Jerkmatelive.com associated with username "jeppej760@gmail.com";

3:23-mj-00128-MMS

20

h.  Snapsext.com associated with username "jeppej760@gmail.com";

i.  Webcam4money.com associated with username "jeppej760@gmail.com";

j.  Camlust.com associated with username "jeppej760@gmail.com";

k.  Gays-cruising.com associated with username "jeppej760@gmail.com";

l.  Uberhorny.com associated with username "jeppej760@gmail.com";

m.  Paypal.com associated with username "jeppej760@gmail.com"

52.  Data from the Cellebrite extraction further indicated that around April 2021, the Kik application was installed on SUBJECT TARGET's cell phone.

a.  When law enforcement had manually reviewed the SUBJECT PHONE around January 28, 2022, however, the interviewing agents did not immediately see the Kik application on the cell phone.  Based on your affiant's training and experience, it is possible that applications may be deleted or hidden and therefore not visible during a manual review.

53.  Multiple iterations of the "jeppej" username were identified from the Cellebrite extraction of the SUBJECT PHONE.  Those variations were jeppej760@gmail.com, jeppej907@gmail.com, jeppej907, keenkyjep907, kinkyjep420907 and jpej19.  Between 2019 and 2022, there were approximately 48 records that showed account access using the various "jeppej" username variants listed.

## SUMMARY OF PROBABLE CAUSE

54.  For the above reasons, your affiant submits that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations,

3:23-mj-00128-MMS

of 18 U.S.C. §§ 2252A(a)(2) (distribution and receipt of child pornography) and 2252A(a)(5) (possession of child pornography) are located on SUBJECT ACCOUNT. Your affiant reached this conclusion for all the above reasons, and as further summarized here:

a. It is known, from Kik Messenger's own reporting to NCMEC in cyber tip report number 74539383, that SUBJECT ACCOUNT made multiple transmissions of child pornography videos using the Kik Messenger application.

b. Law enforcement confirmed that these videos indeed contained child pornography as defined by 18 U.S.C. § 2256(8). They consisted of visual depiction of sexually explicit conduct involving the use of minors engaged in sexually explicit conduct.

c. It is known through FBI's investigation that SUBJECT ACCOUNT was also an administrator for the Kik group "#ch.ildren (Share and T R A D E)" where multiple images of child pornography were observed around August/September 2020.

d. SUBJECT ACCOUNT was accessed over 900 hundred times from IP address **24.237.220.152**, which is associated with the SUBJECT TARGET's residence from subscriber information produced by GCI.

e. SUBJECT PHONE indicated SUBJECT TARGET had installed the Kik Messenger application in April 2021.

3:23-mj-00128-MMS

f.  Despite the installation of the Kik application occurring in 2021, as known from the Cellebrite extraction, based on your affiant's knowledge and experience, social media applications can be readily deleted, hidden, and reinstalled by offenders to evade detection. The fact that SUBJECT TARGET had records on SUBJECT PHONE showing the Kik Messenger application being installed further contradicted SUBJECT TARGET's denial of using this messaging application.

g.  SUBJECT ACCOUNT, that distributed the child pornography videos, was also created with the e-mail account "jeppej910@gmail.com." SUBJECT TARGET has similarly created other accounts with some variation of "jeppej" or "jepj." SUBJECT TARGET has strong, multiple associations with SUBJECT ACCOUNT.

## CONCLUSION

55.    I therefore submit that there is sufficient probable cause to believe that SUBJECT ACCOUNT, as identified in Attachment A, contain fruits, contraband, and evidence of violations of 18 U.S.C. §§ 2252A(a)(2) (distribution and receipt of child pornography) and 2252A(a)(5) (possession of child pornography), and that there is sufficient probable cause to seize the items which are more fully described in Attachment B.

56.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

3:23-mj-00128-MMS

57.     The government will execute this warrant by serving the warrant on

**MediaLab**.  Because the warrant will be served on **MediaLab.** who will then compile

the requested records at a time convenient to it, reasonable cause exists to permit the execution

of the requested warrant at any time in the day or night.

58.     Based upon the foregoing, your affiant respectfully requests that this

Court issue a search warrant for the SUBJECT ACCOUNT.


SARAH NORTH
Special Agent, FBI
Child Exploitation Task Force


Affidavit submitted by electronic means
through email/pdf, and attested to me as true
and accurate by telephone consistent with
Fed.R.Crim. P. 4.1 and 41(d)(3) on
this _____ day of February, 2023.


MATTHEW M. SCOBLE
United States Chief Magistrate Judge
District of Alaska


3:23-mj-00128-MMS

24

# **ATTACHMENT A**

## **Property to Be Searched**

This warrant applies to information that is associated with the Kik Messenger account identified by username letstradeyung92 and National Center for Missing and Exploited Children (NCMEC) cyber tip number 74539383 (hereinafter, "SUBJECT ACCOUNT") that are stored at premises owned, maintained, controlled, or operated by MediaLab.Ai Inc., a company located at 1237 7th Street in Santa Monica, California.

## ATTACHMENT B

**Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.     **Information to be disclosed by MediaLab.Ai Inc. to facilitate execution
       of the warrant**

    To the extent that the information described in Attachment A is within the

possession, custody, or control of MediaLab.Ai Inc., regardless of whether such

information is located within or outside of the United States, including any messages,

records, files, logs, or other information that have been deleted but are still available to

MediaLab.Ai Inc., that have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), or that have been preserved pursuant to National Center for Missing and

Exploited Children (NCMEC) cyber tip number 74539383 by MediaLab.Ai Inc.,

MediaLab.Ai Inc. is required to disclose the following information to the government

for each account or identifier listed in Attachment A identified as the SUBJECT

ACCOUNT for the period between **April 1, 2020 and June 30, 2020**:

    a.   The contents of any available messages or other communication associated

         with SUBJECT ACCOUNT (including, but not limited to text

         communications, chats, videos, photographs, tips for messages with Kin

         balance, attachments, posts, "friend" chat list, recordings, images, or

         communications of any kind sent to and from SUBJECT ACCOUNT,

         including stored or preserved copies thereof), and related transactional

         records for all Kik Messenger services used by SUBJECT ACCOUNT,

3:23-mj-00128-MMS

including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b. All photos and videos uploaded by the SUBJECT ACCOUNT, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c. Basic subscriber records and login history, including all records or other information regarding the registration and identification of the SUBJECT ACCOUNT, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the SUBJECT ACCOUNT was created, the length of service, types of services utilized by the SUBJECT ACCOUNT, the IP address used to register the SUBJECT ACCOUNT, the date on which the SUBJECT ACCOUNT was deactivated and/or closed and associated IP address used to deactivate/close the accounts, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any accounts linked by machine cookies (meaning all users that logged into Snapchat by the same machine as the SUBJECT ACCOUNT);

d. All records or other information related to the SUBJECT ACCOUNT, including contacts and "friend" lists; profile information; subscriptions; membership to groups; location settings, and privacy settings; abuse reports; email events; and all logs, including transactional chat log, chat platform log, blocked user log, friends added log, group information log, group created log, group joined log, group left log, group transactional chat log, and group chat platform log.

e. All records pertaining to communications between MediaLab.Ai Inc. and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken;

f. All records pertaining to devices associated with SUBJECT ACCOUNT and software used to create and access the SUBJECT ACCOUNT, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s); and

g. Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the SUBJECT ACCOUNT or

associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about SUBJECT ACCOUNT or associated user(s) (but not including confidential communications with legal counsel).

MediaLab.Ai Inc. is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant. MediaLab.Ai Inc. shall deliver the information set forth above via United States mail or courier to: Special Agent Sarah North, Federal Bureau of Investigation, 101 E. 6th Avenue, Anchorage, Alaska, 99501 or via e-mail to sanorth@fbi.gov. MediaLab.Ai Inc. is specifically authorized to transmit or send the information specified below to the Federal Bureau of Investigation anywhere in the United States, including, but not limited to, Anchorage, Alaska.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of criminal laws of the United States, specifically of 18 U.S.C. §§ 2252A(a)(2) (distribution and receipt of child pornography) and 2252A(a)(5) (possession of child pornography), including, for SUBJECT ACCOUNT, information pertaining to the following matters:

(a) Communications between SUBJECT ACCOUNT and other Kik Account(s) relating to the transmission of files, data, images, and videos containing child pornography, and any attempt and solicitation to do so;

(b) Evidence of the identification or location of the user(s) of the SUBJECT ACCOUNT;

(c) Evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the SUBJECT ACCOUNT about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(d) Evidence indicating SUBJECT ACCOUNT user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation.

(e) Evidence concerning how and when the SUBJECT ACCOUNT was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to SUBJECT ACCOUNT user;

(f) Evidence concerning the criminal conduct described in the affidavit related to SUBJECT ACCOUNT;

(g) The identity of the person(s) who created or used the account.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and

3:23-mj-00128-MMS

agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3:23-mj-00128-MMS